IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUCE KELLY, JR., | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 23-1595 |
| | : | |
| KINDER MORGAN, INC., | : | |
| Defendant. | : | |

**August 28, 2024**                                    **Anita B. Brody, J.**

## <u>MEMORANDUM</u>

Plaintiff Bruce Kelly, Jr. brings this action against Defendant Kinder Morgan, Inc., his employer until his termination in 2022.  Kinder Morgan operates terminals throughout North America that store and handle fuels and other liquid and dry bulk materials.  Kelly supervised the loading and offloading of cargo at its Philadelphia-area terminal.  Kelly alleges violations of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Age Discrimination in Employment Act ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA").[1]  Kinder Morgan moves for summary judgment (ECF No. 22), and for the reasons stated below, I will grant the motion in part and deny the motion in part.

---

[1] I exercise jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## I.    BACKGROUND

### A.    Employment history

Kelly began his career working at the stevedoring terminal along the Delaware River in Fairless Hills, Pennsylvania in 1995.  In 1997, he took a position as a union worker with Kinder Morgan's predecessor, where he rose to the position of a supervisor.  Kinder Morgan acquired the terminal in 2004 and hired Kelly to continue to work as a supervisor there.  Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF") ¶¶ 1-2, 18, ECF No. 24.  Kelly ultimately held the title of Operations Superintendent and served as the only manager who oversaw the night shift, where several crew leaders reported to him.  Kelly reported to Larry Bragg, the Operations Manager.  Def.'s SUMF ¶¶ 21-34, 38, ECF No. 24.  Bragg, who primarily worked during the day, viewed Kelly as akin to his counterpart on the night shift.  He expected Kelly to be aware of everything that was going on at the terminal at night and communicate those developments so that the day shift could plan their day productively.  Def.'s SUMF ¶ 32, ECF No. 24.

Kelly took FMLA leaves of absence at various times during his employment at Kinder Morgan.  In 2016, he took FMLA leave for gastric bypass surgery.  In 2020, he took FMLA leave to have a stimulator device implanted in his back to address back and leg pain associated with a prior injury.  Def.'s SUMF ¶ 46, ECF No. 24.

### B.     Negative performance review

In the summer of 2021, management began to prepare documentation and notice to Kelly that his performance was not meeting expectations.  Bragg decided to put Kelly on a Performance Improvement Plan ("PIP").  Def.'s SUMF ¶ 72. With the input of Gregg Hartnett, the Terminal Manager, Bragg drafted a memorandum to Kelly about the need to participate in a performance improvement process.  Def.'s SUMF Ex. 16, ECF No. 24-16; Pl.'s Opp. Ex. J, ECF No. 27-13. The memorandum identified three "Examples" of performance deficiencies that Bragg and Hartnett had identified:  (1) "You need to make better operational decisions on the shift you are responsible for overseeing," with particular examples cited; (2) "Your communication and participation needs to be improved," with particular examples cited; and (3) "You have missed work and used unscheduled leave multiple times in the past 6 months.  These instances have put the terminal and team at a disadvantage and had negative impacts on operations."  Def.'s SUMF Ex. 16, ECF No. 24-16.

Utilizing a Kinder Morgan form, Bragg also completed the employer portion of a written PIP form in which the employee was to add his response as to the specific actions he would take to correct the areas identified as a performance deficiency.  Def.'s SUMF Ex. 17, ECF No. 24-17.  The PIP form ultimately identified four areas of performance deficiency, repeating the areas of (1) and (2)

from the lengthier memorandum and characterizing the remaining areas as: (3)
"Your duties observing vessel conditions, boarding vessels to see operations and
overseeing the calls made by crew leaders needs to be improved"; and (4) "You
must improve your attendance and schedule your leave in a timelier manner.  In the
past few months you have taken unscheduled leave numerous times for issues or
circumstances at home."  Def.'s SUMF Ex. 17, ECF No. 24-17.  Finally, Bragg
prepared a draft of a Performance Evaluation review form for Kelly, in the nature
of a mid-year review, which reflected that Kelly was not then meeting expectations
in 11 of the 15 competencies expected of Kinder Morgan management employees.
Def.'s SUMF Ex. 15, ECF No. 24-15.  On August 30, 2021, Bragg called Kelly
into a meeting and presented him with the various documents concerning the PIP.
Def.'s SUMF ¶ 67, ECF No. 24.

At the conclusion of the meeting, Kelly agreed to participate in the PIP
process.  He completed his portion of the PIP form where he was to describe how
he would improve in the four areas identified by Bragg.  As to the fourth of the
four "performance deficiencies," which concerned attendance and the timely
scheduling of leave, Kelly responded:

**Performance Deficiency Response #4**

I will immediately make every effort to improve upon my attendance and be at work on my scheduled shift when expected.

*If I could speak to this...* You stated that in the last few months or last 6 months I've had too much unscheduled time away. I agree, but unfortunately these things were just as unscheduled in my life as they were here at the terminal. A little over 3 months ago I was out 14 days due to my son contracting Covid and getting very sick. My wife and I were ordered confined to our home for these 14 days by the Bucks County Board of Health or face fines and possibly jail time. I forwarded all communications with the Board of Health to KM and when I was instructed by Kinder Morgan I could return to work before these 14 days were up. I planned on returning that next day. But when the HR department received a copy of the letter I received from the Board of Health they later said no do not return. Follow the instructions in the letter. So I don't know what else I could have done there.

Most recently I missed 4 days unexpectedly because I thought I contracted Covid myself. I followed the KM and CDC protocol. For 3 of the 4 days I had a fever that ranged between 100 and 103+. While I had the fever I'm not to report to work. But you're saying this isn't acceptable. Please tell me what it was I should have done different in either of these situations? Without these two incidents I believe I had a couple times I needed to use a Personal Day. Otherwise I don't believe there would be an issue. *Maybe I'm wrong?*

Pl.'s Opp. Ex. J, ECF No. 27-13.

Kelly met with Bragg periodically to review his progress under the PIP. At some of those sessions, Bragg noted that Kelly had improved, and attendance was not cited as a continuing issue. But notes from other sessions reflect that Kelly still did not meet Bragg's expectations in other areas on a consistent basis. Def.'s SUMF ¶ 100, ECF No. 24; Def.'s SUMF Exs. 19-21, ECF Nos. 24-19, 24-20, 24-21. The last progress meeting that Bragg held with Kelly before the 90-day PIP was initially set to end was on November 11, 2021. Def.'s SUMF ¶ 107, ECF No. 24. At that time, Bragg marked Kelly's performance as "acceptable" in three of the four designated problem areas, but not with respect to "communications with operational items and increas[ing his] participation in required areas at the terminal." Pl.'s Opp. Ex. N, ECF No. 27-17.

C.    **FMLA leave**

On November 29, 2021, the day before the PIP period was set to expire,

Kelly reported that he would be absent for his shift, telling Bragg that it was due to

kidney stones.  Def.'s SUMF ¶ 107, ECF No. 24.  However, shortly thereafter,

Kelly wrote this email to Hartnett, the Terminal Manager:

> Gregg I'm writing only you because I want to be honest
> in what's going on but really don't want the entire world
> knowing my business. I don't have kidney stones I regret
> sending that email but at the time wasn't sure what to do.
> Being your TM and we've known each other a very long
> time I figured I'd open communication with you.

> I've taken pain medication for many years for my back
> and my legs. I've decided to come off the medication
> because it seems the spinal stimulator I had put in my
> back is controlling things pretty good but I've taken this
> medication so long I have to detox from it and this I
> wouldn't wish on anyone. Not even Larry! Im doing it
> from home and it's doctor supervised it's just going to
> take time to get out of my system. I'll be the better for it
> once it's all done but right now it sucks!!!

> I know I'm on the PIP and feel I have really got the night
> shift running well but had to do this now. I've been
> putting it off and putting it off and I want to start 2022
> fresh and new. I promise you I will be the better for it
> and I hope you'll give me a chance to prove it with this
> PIP hanging over me.

> Again I hope we can keep this between us and I'll keep
> you informed. My doctors office will take care of all the
> paperwork.

Pl.'s Opp. Ex. P, ECF No. 27-19.  Kinder Morgan approved Kelly for a period of

FMLA leave beginning November 30, 2021.  Def.'s SUMF ¶ 46, ECF No. 24.

Kelly's abrupt announcement that he was going out on leave was not well-received by Kinder Morgan's management.  A December 1 internal email from the Hartnett to Regional Manager Christopher Hamm and HR Regional Manager David Price stated:

> Dave/Chris
>
> I am not sure how to describe Bruce's status or how to proceed.  Larry and I don't believe he is showing the improvement we would like to see and we were contemplating termination or extending the current PIP when we were just blindsided by Bruce's attached emails.  If you read the emails attached you can see Bruce last minute missed his shift again claiming he had kidney stones but then sends an email only to me saying that he is detoxing from the prescriptions drugs he has been on for his back and has wanted to do this for a while now.  In my opinion Bruce is not a workforce employee or even a crew leader who we would expect this type of poor planning and communication from but is a manager who if was planning to go off his medication and now cannot make it into work is part of the reason he was placed on the PIP to begin with.  I am not sure how to proceed or how to even answer Bruce.  Attached are the last few meeting notes as well as Larry's notes he did not sign and give back the notes from 11/11 which was his last meeting due to the holidays he would have had a meeting tomorrow had he not missed work now.  I am not sure if you both would like to discuss the proper course of action with this but I have not answered Bruce's email as of yet.

Pl.'s Opp. Ex. Q, ECF No. 27-20.

Kelly returned to work following his FMLA leave.  He took additional time off in January 2022 when his mother died, following which both he and his wife

caught Covid, which required him to be out for an additional period.  He next had a PIP meeting with Bragg on February 9, 2022.  Bragg rated him as unacceptable in all four areas indicated in the plan.  As to the attendance area, Bragg noted that Kelly was still not providing ample notice when calling out "for personal issues." Pl.'s Opp. Ex. Y, ECF No. 27-28; Def.'s SUMF Ex. 22, ECF No. 24-22.

### D.   Termination

Internal emails between February 14 and 23, 2022 show that Hartnett, Hamm, and Price were discussing whether they should terminate Kelly or give him another month on the PIP.  Def.'s SUMF ¶ 116, ECF No. 24.  They ultimately reached the conclusion that Kelly was not progressing as they would have liked and that the opportunity to improve performance had gone on too long.  Pl.'s Opp. Ex. BB, ECF No. 27-31.  Hartnett tasked Bragg with conveying to Kelly the company's decision to terminate him for failing to make improvements to an acceptable level, and Bragg did so in a meeting with Kelly on March 10, 2022. Def.'s SUMF ¶ 119, ECF No. 24.

Kelly was 52 years old at the time of his termination.  Kinder Morgan did not immediately fill Kelly's position as Operations Superintendent.  Def.'s SUMF ¶ 131, ECF No. 24.  Bragg, who was ten years older than Kelly, retired in the following months.  Def.'s SUMF ¶¶ 126-27, ECF No. 24.  In June 2022, Kinder Morgan promoted a 36-year old crew leader into the Operations Manager position

vacated by Bragg.  Def.'s SUMF ¶ 138, ECF No. 24.

## II.    PROCEDURAL BACKGROUND

After filing an administrative charge, Kelly filed this lawsuit here.  Count I of his complaint, as amended on December 7, 2023, asserts four types of violation of the ADA.  Count II asserts two types of violation of the FMLA.  Count III asserts a violation of the ADEA.  Counts IV and V assert violations of the PHRA for disability (like Count I) and for age (like Count III).  Am. Compl., ECF No. 17.

On March 15, 2024, Kinder Morgan moved for summary judgment, supported by a Statement of Undisputed Material Facts.  Def.'s Mot. Summ. J., ECF No. 22; Def.'s SUMF, ECF No. 24.  Plaintiff responded on April 19, 2024 with a memorandum of law, a response to Defendant's statement of facts, and his counterstatement of undisputed material facts.  Pl.'s Opp., ECF No. 27; Pl.'s Resp., ECF No. 27-1.  Kinder Morgan filed a reply and responded to the counterstatement of facts on May 6, 2024.  Def.'s Reply, ECF No. 30; Def.'s Resp., ECF No. 30-1.

## III.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the evidence would permit

a reasonable jury to return a verdict for the nonmoving party.  *Id.*  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where, as here, the moving party does not have the burden of proof on the relevant issues, the court "must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Revenue*, 922 F.2d 168, 175 (3d Cir. 1990) (citing *Celotex Corp.*, 477 U.S. 317).  If the facts alleged by the movant are not disputed, the Court *may* grant summary judgment "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

In ruling on a motion for summary judgment, the Court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials." Fed. R. Civ. P. 56(c)(1)(A).

## IV.    DISCUSSION

Kinder Morgan alleges that Kelly's claims fail because his termination was due to performance issues unrelated to disability, leave usage, or his age.  It also contends that it did not subject him to harassment nor deny him use of protected leave during his employment.  However, Kelly has presented evidence that raises genuine issues of material fact as to several of his claims when viewed in the light most favorable to him.

### A.    ADA Claims

Kelly alleges that Kinder Morgan violated the ADA both during his employment and in terminating him either because he was disabled within the meaning of the ADA or because Kinder Morgan regarded him as such.  He identifies four distinct theories in Count I: adverse action, retaliation, hostile work environment, and failure to provide reasonable accommodations.

Our Court of Appeals recognizes that the ADA prohibits an employer from: (1) subjecting the employee to an adverse employment action motivated by prejudice or fear; or (2) failing to provide a reasonable accommodation for a disability.  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1998).  The ADA also prohibits retaliation on the basis of certain activities protected by statute.   42 U.S.C. § 12203(a); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

The ADA discrimination and retaliation claims are adjudicated subject to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). If a plaintiff makes out a prima facie case of discrimination or retaliation, the burden shifts to the defendant employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are a pretext for discrimination. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). He can do so either by pointing to reasons to disbelieve the employer's stated reasons or by pointing to evidence supporting a conclusion that the improper reason was more likely than not the reason for the termination. *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994).

Two of Kelly's ADA claims will proceed past summary judgment, for the reasons set forth below.

### 1.    Adverse action claim

A plaintiff seeking relief for an adverse employment action that he suffered due to disability bears the initial burden of establishing a prima facie case, that: (1) he has a disability as defined by the ADA, or is perceived as disabled; (2) he was "qualified" to perform the essential functions of the position; and (3) he was

12

subjected to the adverse action, e.g., terminated, "because of" the disability (or perceived disability). *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Kinder Morgan does not contend that Plaintiff was not "qualified" for the position he held. Rather, it challenges whether he had a disability and whether the disability was the cause of his termination.

Congress has defined "disability" in the ADA, with respect to an individual, to mean: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment" as described in the act. 42 U.S.C. § 12102(1). It defined "major life activities" to include, but not be limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Congress has since reiterated that: the statutory definition of "disability" in the ADA should be "construed in favor of broad coverage of individuals …, to the maximum extent" permitted by the terms of the statute; the term "substantially limits" must be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008; and an impairment that substantially limits one major life activity may reflect a disability even if it does not limit other major life activities. *Id.* § 12102(4).

Kelly contends that he is a qualified individual with a disability because he suffered from "very serious back and leg problems including disc problems, spinal stenosis, neuropathy, and other serious health complications" and that the severe pain these conditions causes limited his ability, at times, to perform daily activities such as "moving and bending (among other daily life activities)."   Am. Compl. ¶¶ 24-25, ECF No. 17.  Kinder Morgan responds that Kelly does not meet the definition of disability because he denied that he was "disabled" when questioned at his deposition and because he testified as to the various physical functions of his position at Kinder Morgan that he could still perform despite his back problems. Def.'s Mem. of Law 14-15, ECF No. 22-1.

Whether Kelly has a disability under the ADA implicates questions of fact that preclude summary judgment.  Kelly testified in his deposition that his back problems prevented him from walking for considerable periods of time and lifting over 50 lbs.  Pl.'s Opp. Ex. A, Kelly Dep. 237-38, 240, ECF No. 27-4.  He also testified that he would call out at times when work was slow if his back was bothering him, and that he would tell Bragg when his absences were due to flareups of back pain.  *Id.* at 240-41, 244, 349-40.  He stated in an affidavit he submitted with his opposition to Kinder Morgan's summary judgment motion that Bragg asked him if he was failing to board and inspect ships – one of the areas in which his performance was viewed as deficient – because back pain prevented him

from doing the necessary climbing.  Pl.'s Opp. Ex. B, Kelly Aff. ¶ 14, ECF No. 27-5.  With this testimony, Kelly has adduced sufficient evidence to raise a genuine issue of material fact as to his protected status under the ADA and/or his employer's perception that he had a disability.

With respect to the causal connection, it is undisputed that at least some of the areas in which Kelly was identified as having deficient performance – which were then cited as the reason for his termination – related to his absences and concerns that he was not performing required tasks, such as boarding vessels, for reasons associated with his back condition.  Kelly satisfies the prima facie elements for purposes of summary judgment review.

Under the *McDonnell Douglas* framework, once a plaintiff makes out a prima facie case of disability discrimination in his termination, then the employer must articulate a non-discriminatory reason for taking that action against him. Kinder Morgan contends that Kelly was terminated due to performance issues and lack of progress in making improvements in the areas identified in the PIP process that are unrelated to attendance.  Kinder Morgan satisfies its burden at the summary judgment stage.

Then the burden returns to the employee to point to reasons a factfinder could disbelieve the employer or conclude that discriminatory animus was more likely than not the reason for the termination.  These questions require evaluations

that must be made by a jury.  These facts do not warrant summary judgment for Kinder Morgan.

### 2.   Retaliation claim

Kelly also claims that his termination was an act of unlawful retaliation for requesting accommodation of his disability.

With respect to retaliation, the ADA provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).  The Third Circuit has held that prohibited conduct under this section of the ADA includes "retaliation against an employee for requesting an accommodation."  *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010).

To present a prima facie case of ADA retaliation, Kelly must show that (1) he participated in an activity protected by the ADA, (2) he was subjected to a materially adverse action at the time, or after, the protected conduct took place, and (3) there was a causal connection between the protected activity and the adverse action. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  A request for reasonable accommodations in good faith constitutes participating in an activity protected by the ADA and fulfills the first prong of this analysis.  *Shellenberger v.*

*Summit Bancorp, Inc.*, 318 F.3d 183, 190-91 (3d Cir. 2003).  Leave time to recover from a condition can be a reasonable accommodation under the ADA.  *See Conoshenti v. Public Svc. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004) (suggesting that a temporary leave of absence might be considered a reasonable accommodation).  The causation element of this cause of action can be met by unusually suggestive temporal proximity, a pattern of antagonism, or where the record as a whole permits an inference of causation.  *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F3d. 217, 232-33 (3d Cir. 2007).

Kinder Morgan contends that the only ADA-protected activity in which Kelly engaged were his requests for "block leave" – his FMLA leaves of absence – and that those requests for leave were not the cause of his termination.  It contends there is no temporal proximity between his leave requests and his termination because the termination decision was effectively made as a result of his lack of improvement while on the PIP, which pre-dated his final leave request, even if the decision was not implemented until March 2022, after Kelly returned from leave. Kelly considers the ADA-protected activity in which he engaged as his requests and utilization of "ADA and FMLA qualifying protected medical leave to care for his medical conditions."  Pl.'s Opp. 13, ECF No. 27-1.  He refers to taking "block leave" to care for his various medical conditions – as recognized by Kinder Morgan as well – but also to his periodic call-outs when he had flare-ups of his

17

back condition, which he believes should have been excused as an accommodation of his disability.  *Id.* at 15.

The record yields more than one interpretation of how Kinder Morgan viewed Kelly and the impact of his unscheduled absences on its decision to terminate his employment.  With respect to his use of block leave, the record demonstrates that Kinder Morgan terminated Kelly not long after his return to work at the end of 2021.  The final PIP meeting he had with Bragg prior to his termination, in February 2022, again identified his attendance as an area in which he had not made acceptable progress.  A jury could reasonably find – as Kelly himself believed – that the comment in the February 2022 PIP meeting notes that he "continues to trend towards not providing ample notice to management for personal issues causing him to miss time at work" was a reference by Bragg to Kelly's detox leave.  Pl.'s Opp. Ex. Y, ECF No. 27-28; *see also id.* (reflecting response by Kelly that he notified Hartnett at the start of his short-term disability leave).  In addition, the first documentation that Kinder Morgan was contemplating termination was memorialized in communications just after Kelly made his request for that leave on November 30, 2021.  A reasonable jury could find from the record that Kinder Morgan's decision to terminate Kelly would not have occurred but for his unscheduled requests for leave arising from his back issues, including his last-minute request to take leave to step down from pain medications.

Kelly has cast sufficient doubt on Kinder Morgan's reasoning for the termination to raise a genuine issue of material fact about whether its decision was retaliatory. His retaliation claim under the ADA will therefore proceed past summary judgment.

### 3.    Hostile work environment claim

Kelly also alleges that he was subjected to a hostile work environment on account of his disability. Am. Compl. ¶¶ 64, 67 & Count I, ECF No. 17. A hostile work environment claim, first recognized in the context of Title VII, requires an employee to show that: (1) he suffered intentional discrimination because of the protected characteristic, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) that there is a basis for respondeat superior liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). To qualify as actionable harassment, there must have been conduct attributable to the employer that was based upon the employee's protected characteristic and was "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 666 (3d Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Third Circuit has assumed that the ADA provides a cause of action for hostile work environment claims. *Id.*

Kinder Morgan contends that Kelly cannot establish that he was harassed "based on his disability" or that he was subjected to harassment that could be described as "severe and pervasive." Its concerns are justified. Kelly's amended complaint refers to "pretextual discipline and demeaning and/or discriminatory treatment towards him." Am. Compl. ¶ 64, ECF No. 17. But his brief in opposition to Kinder Morgan's summary judgment motion does not point to any evidence in the record to enable a jury to find that a reasonable person would find the work environment to be abusive. *See Harris*, 510 U.S. at 21-22 (requiring that a plaintiff show that conduct was both subjectively and objectively hostile or abusive). He has not shown that he was subjected to any harassment, including threats, humiliating comments, or offensive utterances.

There is also a deficiency in the connection between any allegedly hostile environment and the question of disability. Even if the PIP was triggered in part based on absenteeism issues, some of which may have been associated with disability, there is no evidence that the work environment had become oppressive or hostile in any way. And Kelly made no complaints to upper levels of management that Bragg, for example, was making the work environment hostile to him on account of his alleged disability, even though he had open channels of communication with those above Bragg in Kinder Morgan management. *See, e.g.,* Pl.'s Opp. Ex. P, ECF No. 27-19 (11/30/21 email from Kelly to Hartnett, the

Terminal Manager).

Kelly fails to demonstrate that he was subjected to any harassment rising to the level of a hostile working environment based on his disability.   Summary judgment will be granted to Kinder Morgan as to this claim.

### 4.      Failure to accommodate claim

The final claim that Kelly asserts under the ADA is that Kinder Morgan did not satisfy its obligation to offer a reasonable accommodation of his disability.

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer can "demonstrate that the accommodation would impose an undue hardship on the operation of [its] business[.]" 42 U.S.C. § 12112(b)(5)(A).  This cause of action requires the employee to show that: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1998).

This cause of action is inapplicable here.   Kelly received the only accommodation that he ever requested for any disability he had: block leave time.

Kelly does not allege that he was denied other requested accommodations. As Kelly has not introduced evidence sufficient to support a prima facie claim that he was denied reasonable accommodations, summary judgment will be granted as to this claim.

### B.    FMLA Claims

The FMLA provides, in relevant part, that eligible employees are entitled to 12 workweeks of leave during any 12-month period due to the employee's serious health condition. 29 U.S.C. § 2612(a)(1). When an employee returns from FMLA leave, the employer must restore the employee to the same or equivalent position he held, with equivalent benefits and comparable conditions of employment. *Id.* § 2614(a).

Kelly asserts that Kinder Morgan violated his rights under the FMLA in two distinct respects. Only one of these claims raises genuine issues of material fact to proceed to trial.

### 1.    FMLA Interference

The FMLA prohibits both "interference with proceedings and inquiries" and, as described below, "interference with rights":

> (1) Exercise of rights
>
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> (2) Discrimination

> It shall be unlawful for any employer to discharge or in
> any other manner discriminate against any individual for
> opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

Actionable interference with the exercise of FMLA rights is established where: (1) the employee was an eligible employee under the FMLA; (2) the employer is a covered employer; (3) the employee was entitled to FMLA leave; (4) the employee expressed an intention to take FMLA leave; and (5) the employer denied leave to which the employee was entitled, *i.e.*, the FMLA benefits "were actually withheld." *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). The *McDonnell-Douglas* burden shifting analysis does not apply in this cause of action. *Sommer v. Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006).

In his amended complaint, Kelly alleged a number of circumstances that he believed constituted violations of the FMLA, including:

- "failing to inform Plaintiff of his individualized FMLA rights," which he believed reflected a failure to follow proper notice, designation, and information regulations of the FMLA;

- "making negative comments and/or taking actions towards him that would dissuade a reasonable person from exercising his rights under the FMLA;" and

- "failing to designate Plaintiff's intermittent time off during his employment

with Defendant as FMLA-qualifying or FMLA protected leave."
Am. Compl. ¶ 76, ECF No. 17.

As to the interference contentions, Kelly asserts in his brief in opposition to summary judgment that he adduced evidence that Kinder Morgan's conduct "would discourage [him] from taking FMLA leave[.]" Pl.'s Opp. 37, ECF No. 24-1;*see also* 29 C.F.R. § 825.220(b) (reflecting Department of Labor interpretation that interference claims under § 2615(a)(1) encompass actions that "restrain" or "discourage" an employee from taking FMLA leave). He also noted that Kinder Morgan "never presented him with his rights under the FMLA related to his intermittent leave" – presumably a reference to unscheduled call-outs that Kelly says he attributed to back pain – and to his January 2022 COVID-19 absences. Pl.'s Opp. 37, ECF No. 24-1. This evidence, however, does not satisfy the criteria for an interference claim.

This cause of action requires the employee to have expressed an intention to take FMLA leave, following which the employer denied leave. Our Court of Appeals is clear on this point.[2] *See Ross,* 755 F.3d at 191-92; *Sommer,* 461 F.3d at

---

[2] Plaintiff cites to non-binding district court decisions suggesting that actionable FMLA interference includes conduct by the employer that could have a "chilling effect" on the employee's desire to invoke his FMLA rights. Pl.'s Opp. 36-37, ECF No. 27-1. This theory, however, has not been accepted by the Third Circuit. Plaintiff ignores the clear precedents of *Ross, supra*, and *Capps v. Mondelez Global*, 847 F.3d 144 (3d Cir. 2017), which require that the employee have been denied an FMLA benefit to which he was entitled in order to make out an

399; *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).  Here, Kelly

requested FMLA leave at three different points in his employment, the last of which

was at the end of November 2021.  He was granted each leave he requested.  There

is no evidence in the record from which a jury could find that Kinder Morgan

restrained or discouraged Kelly from taking protected leave.  Summary judgment

will be granted to Kinder Morgan on the FMLA interference claim.

### 2.      FMLA Retaliation

Kelly also alleges that he was retaliated against because he used FMLA leave.

 To establish an FMLA discrimination or retaliation claim, an employee must

demonstrate that: (1) he invoked an FMLA right; (2) he suffered an adverse

employment action; and (3) his leave or exercise of his FMLA rights had a causal

connection to that adverse action.  *Ross*, 755 F.3d at 193.  As with the ADA

discrimination and retaliation provisions above, an employer can rebut this prima

facie case by articulating a legitimate reason for the adverse employment action.

*Krouse*, 126 F.3d at 500.  If an employer meets that obligation, the burden shifts

back to the plaintiff to rebut the employer's explanation of the reasoning behind the

adverse employment action.  *Id.*

As described above as to the ADA retaliation claim, while Kinder Morgan

may have a strong case justifying termination on the basis of performance, there

---

interference claim.

are questions of fact for a jury to decide as to whether Kelly's invocation and use of FMLA leave at the end of 2021 motivated the termination decision. While Kinder Morgan was clearly concerned about Kelly's performance prior to his utilization of FMLA leave on November 30, 2021, there was not yet any documentation that termination had been decided upon. Bragg testified that he had decided to terminate around the time of the November 11, 2021 PIP meeting. Pl.'s Opp. Ex. E, Bragg Dep. 63, ECF No. 27-8. However, other evidence in the record casts doubt on the timing of that decision. An email message that Hartnett, the terminal manager, composed on December 1, 2021 reflected only that termination had been under consideration by Bragg and himself, but not that it was determined. Pl.'s Opp. Ex. Q, ECF No. 27-20. Moreover, the record supports the view that Hartnett and Bragg viewed Kelly's perceived failure to coordinate the timing of his FMLA leave to step down from his pain medications as further evidence that he did not appreciate operational concerns. *See id.* In addition, following his return from FMLA leave, Bragg again criticized Kelly in the February PIP meeting for not providing ample notice when calling out "for personal issues." Pl.'s Opp. Ex. Y, ECF No. 27-28.

Kelly's FMLA retaliation claim will proceed to trial because Kelly demonstrates that there is a genuine dispute of material fact about whether he was terminated due to his use of FMLA leave time.

### C.    ADEA Claim

The final federal claim Plaintiff asserts is one of age discrimination.

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To prevail on an ADEA claim, a plaintiff must establish that age was the "but-for" cause of the adverse employment action.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).  This standard is also described as meaning that the plaintiff's age was "a determinative factor" in the termination decision.  *Id.*

Our circuit precedents assume that the ADEA analysis proceeds according to the *McDonnell Douglas* burden-shifting framework utilized in other federal causes of action.  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).  The elements of a prima facie case of age discrimination are: (1) the plaintiff is at least forty years old; (2) he suffered an adverse employment decision; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive.  *Id.*  Where the plaintiff is not directly replaced, however, the fourth element is satisfied if he provides facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  *Id.*

27

(quotation omitted).

Kelly was over 40 years old and was terminated from a position for which he was qualified, so he satisfies prongs 1, 2, and 3.  The question comes down to whether the circumstances of the termination suggest that Kelly's age was a determinative factor in the termination decision.  This record does not contain sufficient evidence from which a jury could find age discrimination in the termination decision.  There is no direct evidence of age discrimination.  No age-related comments were ever made about Kelly by Bragg or anyone else.  There is no other evidence that Bragg maintained any animus towards Kelly based on his age — Bragg was even older than Kelly.

Plaintiff relies upon two pieces of evidence to suggest that age was a determinative factor in the termination decision.  First, one of the items in the annual review form, which Bragg previewed with Kelly at their August 30, 2021 meeting, concerned identifying a "successor."  Pl.'s Opp. Ex. I, ECF No. 27-12. Kelly contends that because Bragg wanted him to identify a "successor," he was effectively pushing him to retire, which can be seen as age discrimination.  This is not a reasonable reading of the record.  The "successor" item was just one item in Kinder Morgan's annual review form.  It was not the focus of the plan to improve Kelly's performance, nor was the lack of an identified "successor" referenced in any of the numerous emails that are in the record concerning the reasons Kinder

28

Morgan was concerned about Kelly's performance.

Second, Plaintiff believes that he was replaced on the night shift by the crew leaders, all of whom were younger than he.  While certain operational duties may have been picked up by the crew leaders in Kelly's absence on an interim basis, there is no genuine dispute in the record that Kelly's position had not been filled even months later.  There are no facts concerning a replacement from which a jury could infer that Kelly's age was a determinative factor in the company's decision to terminate him.

Kelly fails to make out a prima facie case of age discrimination.  Summary judgment will be granted on the ADEA claim.

### D.   PHRA Claims

Finally, Kelly brings claims against Kinder Morgan under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, alleging discrimination on the basis of his disability and/or perceived disability as well as his age.  Am Compl. Counts IV, V, ECF No. 17.

Disability and age discrimination claims under the PHRA are evaluated under the same standards as claims under the ADA and ADEA.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (approving analysis of PHRA claims as co-extensive with ADA and ADEA claims); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1998).

Because Kelly's adverse-action and retaliation ADA claims against Kinder Morgan raise genuine disputes of material facts, his PHRA claim of disability discrimination on these bases in Count IV necessarily does as well. But the deficiencies identified as to the age discrimination claim asserted under the ADEA apply with the same force to the claim for age discrimination under the PHRA in Count V. Therefore, summary judgment will be granted in part as to Kelly's PHRA claim of disability discrimination and in full as to his PHRA claim alleging age discrimination.

## V.   CONCLUSION

For the reasons discussed above, I will grant Defendant's Motion for Summary Judgment (ECF No. 22) as to Kelly's ADA reasonable accommodations and hostile work environment claims, his FMLA interference claim, his ADEA claim, and his PHRA claims alleging failure to offer reasonable accommodations, hostile work environment, and age discrimination. Summary judgment will be denied as to Kelly's adverse-action and retaliation ADA claims, his FMLA retaliation claim, and his PHRA claim asserting adverse action disability discrimination and retaliation. An appropriate order follows.

_s/ANITA B. BRODY, J.____
ANITA B. BRODY, J.